**UNITED STATES  DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**DAVID LEFEVRE**                                              **CIVIL ACTION**

**VERSUS**                                                          **NO. 05-6288**

**BURL CAIN, WARDEN**                                     **SECTION "J" (6)**

## REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review, this court determined that the State court record provided an insufficient factual basis upon which to adjudicate petitioner's federal habeas corpus claims relating to his self-representation in a jury trial while shackled.  (Rec. doc. 10, p. 11).  Accordingly, counsel was appointed to represent petitioner (rec. doc. 13) and an evidentiary hearing was held in the matter, following which, both parties submitted post-hearing memoranda.  (Rec. docs. 68, 69, 70).  For the following reasons, it is hereby recommended that the instant petition for habeas corpus relief be **GRANTED.**

## I. PROCEDURAL HISTORY

On June 21, 1999, petitioner, David Lefevre, also known as David Lefeure,[1] a state prisoner presently incarcerated in the Louisiana State Penitentiary in Angola, Louisiana, was charged with two counts of armed robbery, two counts of second degree kidnaping, and one count of aggravated burglary of a business. On February 4, 2000, following trial by jury, Lefevre was determined to be guilty as charged. Lefevre was originally sentenced to consecutive terms totaling over 200 years of imprisonment. *See State v. Lefeure*, 778 So.2d 744, 747 (La. App. 5 Cir. 2001). On appeal, the Louisiana Fifth Circuit reversed one of Lefevre's armed robbery convictions, finding it violative of the prohibition against double jeopardy. *Id*. at 750-753. The court also vacated Lefevre's sentences and remanded the matter for re-sentencing, reasoning:

> Here, the trial court sentenced the Defendant, without any particular justification other than that the crimes were violent, to the maximum sentence for each offense and then ordered that the sentences were to run consecutively, despite the fact that the crimes arose out of a singular transaction. Thus, the Defendant was sentenced to 209 years in prison without benefit of parole, probation or suspension of sentence. This sentence shocks our sense of justice. We find that it makes no measurable contribution to acceptable goals of punishment, needlessly imposes pain and suffering, is grossly out of proportion to the gravity of the offense and was an abuse of the trial court's sentencing discretion....
>
> In imposing the maximum sentences for each offense and ordering that the sentences were to run consecutively, the trial judge did not articulate any specific reasons for doing so, despite the fact that the law is well settled that

---

[1] In several state court opinions, the petitioner is referred to as "David Lefeure", rather than "David Lefevre", the spelling provided in connection with the instant application for federal habeas corpus relief.

such sentences are reserved for the worst offenses and the worst offenders and specific reasons for justifying the imposition of such sentences must be expressly articulated.  Neither the Defendant nor his offenses are the worst of the class.

Therefore, we find that the imposition of maximum sentences for each of the four offenses, to run consecutively, which total 209 years without benefits, without articulated reasons or reasons evident from the record, is constitutionally excessive and must be vacated.

*Id*. at 755-756.

Pursuant to the above decision, the trial court re-sentenced Lefevre, again sentencing him to consecutive terms totaling over 200 years of imprisonment.[2]  On appeal, the Louisiana Fifth Circuit again vacated Lefevre's sentences and remanded the matter to the trial court, finding that Lefevre "was re-sentenced in violation of his constitutional right to counsel."  *State v. Lefeure*, 807 So.2d 922, 924 (La. App. 5 Cir. 2002).

Pursuant to the above decision, the trial court sentenced Lefevre for a third time, again sentencing him to consecutive sentences totaling over 200 years of imprisonment.[3]  On appeal, the Louisiana Fifth Circuit noted that the trial court's most recent sentencing of Lefevre was "identical to the sentence this Court found constitutionally excessive on defendant's first appeal...."  *State v. Lefeure*, 831 So.2d 398, 402 (La. App. 5 Cir. 2002).  Finding that Lefevre's sentence was "still constitutionally excessive" and that "it appears that the trial court does not intend to alter the defendant's 209 year consecutive

---

[2]*See* State rec., vol. 6 of 8, pp. 21-22.

[3]*See* State rec., vol. 7 of 8, pp. 18-25.

sentence", the state appellate court "amend[ed] the defendant's sentence and order[ed] that defendant be sentenced to imprisonment at hard labor for 99 years on Count 1 [armed robbery], 30 years on Count 2 [aggravated burglary], 40 years on Count 3 [second degree kidnaping], and 40 years on Count 5 [second degree kidnaping], with the sentences on each count to run concurrently and without benefit of parole, probation or suspension of sentence."  *Id*.  Thereafter, the Louisiana Supreme Court amended Lefevre's 30-year sentence in connection with his aggravated burglary conviction, deleting that portion of the sentence which specified that it was to be served without benefit of parole, probation or suspension of sentence.  *State ex rel. Lefevre v. State*, 855 So.2d 291 (La. 2003).

In addition to the above-described proceedings which led to his final convictions, Lefevre filed a myriad of other pleadings with the state courts, including a December 2, 2003 application for post-conviction relief wherein he raised the claims which he raises in the instant matter.  The state trial court denied Lefevre post-conviction relief pursuant to its July 30, 2004 and August 11, 2004 Orders.[4]  On September 1, 2004, the Louisiana Fifth Circuit Court of Appeal, finding "no error in the trial court's rulings of July 30, 2004 and August 11, 2004", denied Lefevre's writ application.[5]  Finally, on June 24, 2005, Lefevre's efforts to obtain state post-conviction relief came to an end when the

---

[4]A copy of the state district court's July 30, 2004 Order is contained in the State rec., vol. 3 of 8, tab 24.  A copy of the state district court's August 11, 2004 Order is contained in the State rec., vol. 3 of 8, tab 27.

[5]A copy of the state appellate court's September 1, 2004 Order is contained in the State rec., vol. 3 of 8, tab 28.

Louisiana Supreme Court denied his writ application.  *See State ex rel. Lefevre v. State*, 904 So.2d 738 (La. 2005).

On September 19, 2005, Lefevre filed the instant petition for writ of habeas corpus, raising the following claims:  1) that he was denied effective assistance of counsel on appeal; 2) that his waiver of counsel at trial was not knowingly and intelligently made; and, 3) that his right to self-representation and right to a fair trial were violated.[6]  The State, in its response (rec. doc. 8), concedes that the instant petition is timely and that Lefevre has exhausted his state court remedies as required under *Rose v. Lundy*, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982).  The State, however, contends that "petitioner's second, third, fourth, and fifth claims [are] procedurally defaulted upon independent and adequate state court grounds.  Specifically, the state courts relied upon Louisiana Code of Criminal Procedure Article 930.4 to deny relief as to the claims."[7]  In support of the above contention, the State relies upon the district court's July 30, 2004 Order, wherein the court, in pertinent part, stated:

> This instant order comes in response to the State's response filed on June 24, 2004.  The remaining claims alleged by the defendant are as follows:  2) defendant's waiver of counsel was not "knowing and intelligent"; 3) defendant was denied of [sic] counsel's assistance at critical stages of trial; 4) defendant's right to self-representation was not honored; and 5) defendant was

_____

[6]Claim 3) comprises a consolidation of petitioner's third, fourth, fifth and sixth claims.  *See* rec. doc. 5, petitioner's supporting brief at p. 3.

[7]*See* Federal rec., doc. 8, State's response at  p. 12.  Petitioner's second, third, fourth, and fifth claims, the claims which the State contends are procedurally defaulted, comprise claims 2) and 3) in the instant federal habeas application.

not informed of the nature of his accusation.

In its response, the State argues that defendant's claims are barred pursuant to La.C.Cr.P. art. 930.4(B) and 930.4(C). Pursuant to La.C.Cr.P. art. 930.4(D), a successive application may be dismissed if it raises a new or different claim that was inexcusably omitted from a prior application.[8] La.C.Cr.P. art. 930.4(F), requires an inmate filing an application for post-conviction relief to "explain why" he may have "failed to raise a particular ground" in earlier proceedings. However, the court in *State ex rel. Rice v. State*, 749 So.2d 650 (La. 1999), has held that proper use of the Uniform Application satisfies the requirements of La.C.Cr.P. art. 930.4(F) without the need for further filings, formal proceedings, or a hearing. Thus defendant's claim is denied as successive.

Accordingly;

**IT IS ORDERED BY THE COURT** that defendant's motion be and the same is hereby **DENIED**.[9]

In response to the State's procedural default argument, Lefevre, in his traverse (rec. doc. 9), argues that the state district court, by virtue of its August 11, 2004 Order, denied his claims on the merits.[10] The state court's August 11, 2004 Order provides, in pertinent part, as follows:

Due to a clerical or ministerial error, this Court stated that defendant's application was denied on January 1, 2004; however, defendant's application was not denied until July 30, 2004. This order now serves as a nunc pro tunc that the Defendant's PCR was denied on the merits by this court on July 30, 2004.

Further, [a] careful review of defendant's record reveals that following

---

[8]While the state court, in its July 30, 2004 Order, cites La.C.Cr.P. art. 930.4(D), the court quotes the provisions of La.C.Cr.P. art. 930.4(E) which provide: "A successive application may be dismissed if it raises a new or different claim that was inexcusably omitted from a prior application."

[9]A copy of the July 30, 2004 Order, to which the above footnote was added, is contained in the State rec., vol. 3 of 8, tab 24.

[10]*See* Federal rec., doc. 9, Lefevre's traverse at p. 2.

a review of defendant's application for post-conviction relief filed on December 2, 2003 and the State's response filed on June 24, 2004, this Court properly addressed and denied defendant's claims on July 30, 2004....

Accordingly;

**IT IS ORDERED BY THE COURT** that this order serve as a nunc pro tunc that the Defendant's Application for Post-Conviction relief filed on December 2, 2003 was denied on the merits by this Court on July 30, 2004....[11]

Clearly, it is difficult to reconcile the district court's July 30, 2004 Order, wherein the court states that Lefevre's claims are denied as successive, with its August 11, 2004 Order, wherein the court states that Lefevre's claims were "denied on the merits by this Court on July 30, 2004."[12]  To attempt to understand the court's August 11, 2004 Order, one must look to the court's July 6, 2004 Order which contains the "clerical or ministerial error" referenced in the August 11th Order.  Specifically, in its Order dated July 6, 2004, the state district court erroneously stated that it denied Lefevre's application for post-conviction relief on January 1, 2004.[13]  By virtue of its August 11, 2004 Order, the court was attempting to rectify its error, explaining that Lefevre's post-conviction application was not actually denied until July 30, 2004, and that its July 30, 2004 Order represented the court's substantive decision or decision "on the merits."  The court was not using the phrase, "on the merits",

---

[11]A copy of the district court's August 11, 2004 Order is contained in the State rec., vol. 3 of 8, tab 27; a copy has also been submitted to the court by Lefevre as Exhibit "AA".

[12]The difficulty in reconciling the two opinions is illustrated by a review of the State's response (rec. doc. 8) which reflects that despite its claim that petitioner's claims are procedurally barred, the State nevertheless addresses the merits of said claims.

[13]Copies of the district court's July 6, 2004 Order are contained in the State rec., vol. 3 of 8. One copy is located behind tab 25 and another is located behind tab 26.

in its literal sense.  A review of the July 30, 2004 Order clearly reflects that it was not, literally, an adjudication on the merits.  Instead, the court, in its August 11, 2004 Order, was using the phrase, "on the merits", in the sense that its July 30, 2004 opinion represented its official, substantive decision that Lefevre's claims, pursuant to La.C.Cr.P. art. 930.4(E), were subject to dismissal as successive.

Generally, a federal court will not review a question of federal law decided by a state court if the decision of that state court rests on a state ground that is both independent of the merits of the federal claim and adequate to support that judgment.  *Amos v. Scott*, 61 F.3d 333, 338 (5th Cir.), *cert. denied*, 516 U.S. 1005, 116 S.Ct. 557, 133 L.Ed.2d 458 (1995), *citing Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989). This "independent and adequate state law" doctrine applies to both substantive and procedural grounds and affects federal review of claims that are raised on either direct or habeas review.  *Amos*, 61 F.3d at 338.  (citations omitted).  As explained in *Coleman v. Thompson*, 501 U.S. 722, 730-31, 111 S.Ct. 2546, 2554, 115 L.Ed .2d 640 (1991):  "In the habeas context, the application of the independent and adequate state ground doctrine is grounded in concerns of comity....  Without the rule, ... habeas would offer state prisoners whose custody was supported by independent and adequate state grounds ... means to undermine the State's interest in enforcing its laws."

In order to fulfill the independence requirement of the above-described doctrine, the last state court rendering a judgment in the case must "clearly and expressly"

indicate that its judgment is independent of federal law and rests on a state procedural bar. *Amos*, 61 F.3d at 338; *Harris*, 489 U.S. at 263, 109 S.Ct. at 1043. When the last state court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, the federal court will presume that the state court has relied upon the same grounds as the last **reasoned** state court opinion. *Ylst v. Nunnemaker*, 501 U.S. 797, 802, 111 S.Ct. 2590, 2594, 115 L.Ed.2d 706 (1991) (emphasis added).

In the instant matter, the state district court issued the last reasoned opinion. The state district court, pursuant to La.C.Cr.P. art. 930.4(E), denied Lefevre's claims as successive.

Given the fact that in its ruling the state district court relied upon a state procedural bar, i.e., La.C.Cr.P. art. 930.4(E), the "independent" requirement has been satisfied. However, as shown below, the "adequacy" requirement has not.

La.C.Cr.P. art. 930.4(E) provides: "A successive application may be dismissed if it raises a new or different claim that was inexcusably omitted from a prior application." In the instant case, the pertinent claims were not "inexcusably omitted from a prior application." Lefevre filed no prior application.

Generally, for purposes of determining whether or not a procedural bar is "adequate", the issue to be resolved is whether it is regularly applied to similar claims. *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir.1997), *cert. denied*, 523 U.S. 1125, 118 S.Ct. 1811, 140 L.Ed.2d 949 (1998); *Amos*, 61 F.3d at 339. Because "similar claims", i.e., claims

which are the subject matter of a petitioner's first post-conviction application, are not regularly deemed to be barred as successive under Article 930.4(E), the court finds that the procedural bar, as applied in this instance, is not adequate.  *See Poree v. Cain*, 1999 WL 518843, *4 (E.D. La. July 20, 1999) (denial of post-conviction relief on erroneous procedural default ground does not constitute an "adequate" ground  for purposes of precluding federal habeas review).   Accordingly, the court shall review the facts and applicable standard of review before proceeding to analyze the merits of petitioner's claims.

## II.  FACTS[14]

On May 30, 1999, Brenda Moore (Moore) was working as a salesperson at Bayou Daiquiris on Veterans Boulevard in Metairie, Louisiana.  Her responsibilities included cleaning up and counting and dropping off money at the bank.  Bayou Daiquiris closed at 11:00 p.m. on May 30, 1999.  Moore counted the money and turned off the lights.  When she unlocked the door to leave, a man, later identified as the defendant, pushed the door open. He pointed a gun at her and told her to move back into the store.  He questioned her about the money.  She went to the money and gave it to him.  He told her to sit on the floor, take the money out of the bag, show it to him, and then put it back into the bag.  She did everything that she was told.  The defendant told her to make sure everything was like it was supposed to be.  He continued to point a silver-colored handgun at her.  The defendant then

---

[14]The facts are taken from the Louisiana Fifth Circuit Court of Appeal's opinion, *State v. Lefeure*, 778 So.2d 744, 747-749 (La. App. 5 Cir. 2001).

told her to get up and go outside with him.  He took the keys and locked the back door or had her lock it, she was unclear on that point.  He then told her to get into the passenger seat of her white Honda Civic because he was going to drive.

Moore and the defendant rode down Veterans Boulevard.  The defendant asked her how to get to Slidell.  Moore, thinking quickly because she thought that she was going to die, told the defendant to go to Cleary in order to get to Airline.  They needed gas, so they stopped at a Texaco station on Airline Highway.  The defendant told Moore that they would get out of the car and pretend to be boyfriend and girlfriend.  The defendant also told Moore to feel the gun behind his pants.  They then got out of the car and walked to the door, but the station was closed.  The defendant, thereafter, took the gun from the back of his pants and held it to Moore's side or back. The defendant then instructed Moore to get back into the car and that she should not run or do anything.

While the defendant and Moore proceeded to get back inside the car, Moore was thinking to herself, as they drove down Airline Highway, that she had to get out of the car.  When they got close to David Drive, Moore hoped that the light would turn red, which it did.  Moore then jumped out of the car and ran back towards New Orleans.  She did not see or hear the defendant. Moore talked to the police later that night at the corner of David Drive and Airline Highway.

Meanwhile, also on the night of May 30, 1999, Aubrey Cox (Cox) was traveling down Airline Highway near David Drive in a 1982 Lincoln Towncar.  There was a car that had stopped for the red light right in front of him.  Cox saw a screaming young lady

11

run behind his car. Before Cox could move from behind the car in front of him, the defendant jumped into the front passenger seat of his car, which was unlocked.  The defendant had a gun and told Cox to drive. The defendant told Cox to turn right at David Drive, which he did.

When Cox's vehicle got to West Metairie Avenue, the defendant told Cox to turn right. Cox did everything that the defendant said because he did not want to get shot. Cox testified that the defendant kept the gun to Cox's side.  The defendant kept looking back and told Cox to continue driving fast.  Cox told the defendant that he was running out of gas. When they got to Cleary, the defendant told Cox to turn left.  The defendant then told Cox to pull into an E-Z Serve gas station and that he was going to give Cox $15 for his trouble and for gas.  Cox told the defendant to go in and pay for the gas and Cox would pump the gas.  The defendant went into the gas station and never returned.  Cox proceeded to pump $15 of gas, then left the station, turned around, and went down West Metairie Avenue.

When Cox got close to David Drive, the police stopped him.  The police checked his car and found some money.  Cox told the officers that the defendant either forgot the money or left it there, but that he had no idea where it came from.

Deputy Myron Gaudet responded to a car jacking complaint on May 30, 1999. The investigation led him to an E-Z Serve location on Cleary.  He and other officers spoke to the clerk at the E-Z Serve, Barbara Williams (Williams).  She told the officers that the defendant came in and paid $15 for gas.  Williams stated that she recognized the defendant because he was an everyday customer at the store.  She knew that he lived behind the store in an apartment complex and that he drove a K & G Wrecker towing truck.

Based on the information which Williams gave to the officers, they went to an apartment complex on Cleary.  They saw a white tow truck in the parking lot with K & G Towing written in orange on the side.  They spoke to the apartment manager who gave them the defendant's apartment number.  They went to the apartment and knocked on the door. The defendant opened the door, wearing shorts and sweating profusely.  The defendant matched the description of the perpetrator in size, build, and facial features.  Accordingly, the officers handcuffed defendant and advised him of his *Miranda* rights and of the investigation.

Deputy Gaudet brought Cox to the apartment complex on Cleary and Cox identified the defendant as the man who had kidnaped him.  The police showed Moore the money which they recovered and she identified it as the money which the defendant had stolen from Bayou Daiquiris.  Moore also identified the defendant as the perpetrator.

## III.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact.  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning.  A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams[ v. Taylor*, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); *see also Hill*, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

Due to the fact that the state courts did not adjudicate Lefevre's claims 2) and 3) on the merits nor were these claims properly dismissed pursuant to an adequate procedural bar, this court cannot utilize the above-described deferential habeas standard of review.

14

Instead, the court must undertake a *de novo* review.  *See Powell v. Quarterman*, 536 F.3d 325, 343 (5th Cir. 2008) (citations omitted) ("When a claim has been fairly presented to the state court, but the state court does not adjudicate the claim on the merits, and the claim is not procedurally defaulted, the deferential AEDPA standards of review do not apply.  We therefore review the district court's decision on the merits."); *Flagg v. Wynder*, 2008 WL 861498, *3 (E.D. Pa. Mar 27, 2008) (citations omitted) ("[I]f [p]etitioner fairly presented a claim to the state court (i.e., exhausted it), but the state court completely failed to address it, or refused to consider it because of an inadequate procedural bar, we review the claim *de novo*."); *See Thornton v. Wall*, 2003 WL 1810524, *9 (D.R.I. Mar 31, 2003) (citations omitted) (Since petitioner's claim was presented to the state courts, but was not actually adjudicated on the merits, "the standard set forth by AEDPA is not applicable.  Rather, this court must conduct a *de novo* review....").

## IV.  ANALYSIS

### A.  Applicable Facts Regarding Waiver of Counsel and Right to Self-Representation Issues

On February 3, 2000, Lefevre's case was called before the Honorable Robert A Pitre, Jr.[15]  In response to Judge Pitre's inquiry as to whether the litigants were "ready for trial", Lefevre informed:  "Your Honor, I'd like to ask for a motion to be filed to represent

_____

[15]*See* State rec., vol. 5 of 8, p. 156.

myself in this proceeding."[16]  Thereafter, the following colloquy ensued:

THE COURT:

Mr. Lefeure, I don't - - the Court doesn't think that you're capable of conducting a trial on your own.  The only way the Court will let you participate in your own defense is if Mr. Benz [counsel originally appointed to represent petitioner] sits with you and advises you.

MR. LEFEURE:

I'll accept his advice.

THE COURT:

You understand that you're bound by the same rules of evidence that attorneys are bound by, when you represent yourself.

MR. LEFEURE:

Yes, sir.

THE COURT:

Do you have anything you want to say, Mr. Benz?

MR. BENZ:

May I approach a minute, Your Honor?

THE COURT:

All right.

(Whereupon the following bench conference [outside Lefevre's presence] was then held)

MR. BENZ:

I think you need to ask him what right he's giving up, the fact that he is giving up –

THE COURT:

The Sixth Amendment.

MR. BENZ:

Yeah.  Go into that and then ask him if he realizes that he's waiving his right to Counsel.

---

[16]*See* State rec., vol. 5 of 8, p. 158, lines 18-21.

THE COURT:

    But, he's not waiving it completely.

MR. BENZ:

    Well, but, I mean, I'm just sitting there advising him.

THE COURT:

    I know.

MR. BENZ:

    He's asking the questions and all.  If he asks me a question, I'll advise him, and I think that I'm going to pick the jury.

THE COURT:

    Yeah.

MR. BENZ:

    He wanted me to pick the jury and I've agreed to do that.

THE COURT:

    All right.

    (Whereupon the bench discussion was then concluded.)

THE COURT:

    Mr. Lefeure, do you understand that you have a right to Counsel under the United States Constitution, and under the Constitution of the State of Louisiana?

MR. LEFEURE:

    Yes, sir.

THE COURT:

    Do you understand that what you're doing is you're asking the Court to waive that right?  Do you understand what it means?

MR. LEFEURE:

    Yes, sir.

THE COURT:

    Okay.  And, do you understand that the Court is going to require Mr. Benz to sit here through the trial and assist you?

MR. LEFEURE:

    Yes, sir.

THE COURT:

    All right.  Anything else?

MR. BENZ:

    No, Your Honor....[17]

Following the above colloquy, it was determined that the court would proceed with jury selection.  However, prior to the prospective jurors entry into the courtroom, Lefevre moved to have his leg shackles removed.  The trial court denied Lefevre's motion, ordering that his handcuffs be removed, but not his leg shackles.[18]  A review of the trial transcript reflects that the court offered no reasons as to why he refused to remove Lefevre's leg shackles.  However, in an affidavit dated January 8, 2008 (rec. doc. 29), Judge Pitre attests:

> David Lefevre was maintained in leg shackles during his trial due to his multiple prior attempts to escape from custody.  At the time of his trial, Lefevre had an attempted simple escape charge pending before the Court.   I was aware that Lefevre was a very fast runner and had been advised from jail transporting personnel that Lefevre was going to try and escape from the courtroom.

After denying Lefevre's motion to remove his leg shackles, the trial court proceeded to select the jury.  Thereafter, the prosecutor and Mr. Lefevre gave their opening statements, then the prosecutor examined, and Lefevre cross-examined, the victims, Brenda

---

[17]*See* State rec., vol. 5 of 8, p. 158, lines 22-32; p. 159-160; p. 161, lines 1-6.

[18]*See* State rec., vol. 5 of 8, p. 162, lines 1-9.

Moore and Aubrey Cox.[19]  Lefevre performed these tasks while sitting at or standing behind

counsel table so that jurors could not observe that he was wearing leg shackles.

During the direct examination of victim Cox, Lefevre lodged an objection

because Cox was providing rambling answers beyond the scope of the prosecutor's

questions.  In response to Lefevre's objection, standby counsel, John Benz, asked, "may we

approach?"  In response, Benz and Vincent Paciera, one of the prosecutors, proceeded to the

bench to discuss the problem with the trial judge while Lefevre remained at counsel table.[20]

In response to standby counsel's request and without objection from the prosecution, the

court admonished the witness to confine his testimony to simple responses to the questions

he was asked.[21]

Following opening remarks and the examination of the victims, the trial court,

outside the presence of the jury, recommenced taking testimony in connection with a pending

motion to suppress.[22]  After denying the motion to suppress, the following colloquy ensued:

_____

[19]*See* State rec., vol. 5 of 8, p. 180, lines 21-32; pp. 181-199; p. 200, lines 1-19; p. 210, lines 14-32; pp. 211-249.

[20]Juror Nancy Keylon testified that Lefevre did not accompany the lawyers when they proceeded to the bench during trial to speak with the judge.  *See* rec. doc. 68, evidentiary hearing transcript, p. 36, lines 12-16.

[21]*See* State rec., vol. 5 of 8, pp. 244-245.

[22]The court had earlier commenced hearing the motion to suppress testimony, *see* State rec., vol. 5 of 8, p. 162, lines 22-32; pp. 163-178; p. 179, lines 1-18, but had to continue the matter when necessary witnesses had not yet arrived at court.  *See* State rec., vol. 5 of 8, p. 179, lines 19-32; p. 180, lines 1-22.

THE COURT:

Mr. Lefeure, do you want to reconsider your position with regard to representing yourself and let Mr. Benz assist you?

MR. LEFEURE:

Not if I have to totally disband my right to speak, no, sir.  You know, maybe if I could get Mr. Benz in a bigger role.

THE COURT:

Well, that's between you and Mr. Benz.

MR. BENZ:

I can only advise him.

THE COURT:

All right.  Go get the jury.[23]

Following the above exchange, no further discussion was held regarding Lefevre's decision to represent himself while required to wear leg shackles.

The prosecution proceeded to call its remaining witnesses, including Ms. Trenese Levy Baker, an eyewitness to a portion of the pertinent events, along with Deputy Myron Gaudet, one of the arresting officers.  Ms. Baker made an in-court identification of Lefevre as the person she had seen on the night in question.  Lefevre objected to Ms. Baker's in-court identification, immediately following which, standby counsel Benz stated: "May we approach, Your Honor?".[24]  Once again, Benz and Paciera proceeded to the bench to argue the objection while Lefevre, who lodged the objection, remained behind at counsel table. The court, following stand-by counsel's argument, and the prosecutor's response thereto,

---

[23]*See* State rec., vol. 5 of 8, p. 263, lines 22-32; p. 264, lines 1-5.

[24]*See* State rec., vol. 5 of 8, p. 268, lines 6-21.

denied Lefevre's objection.[25]

Deputy Gaudet offered testimony regarding his investigation of the incident at issue.  Gaudet stated that pursuant to his interview with an E-Z Serve gas station clerk, he learned that the suspect drove a tow truck and lived in the apartment complex located behind the E-Z Serve.  Gaudet then proceeded to the apartment complex where he saw a tow truck which fit the description provided by the E-Z Serve clerk.  Thereafter, Gaudet spoke with the apartment complex manager who provided him with the apartment number of the person who drove the tow truck.  Gaudet then knocked on the apartment door, Lefevre answered the door and, seeing that he fit the description of the perpetrator, Gaudet proceeded to handcuff Lefevre, advise him of his rights, then search his apartment.[26]  With respect to what happened next, the following colloquy took place:

Q.  Okay.  And, as you began to search the apartment, what, if anything, happened?

A.  Well, while we were searching the apartment, - - beginning to, anyway, - - this was just all beginning to get going, because we had a lot of people involved in it - - the Defendant, David Lefeure, - -

MR. LEFEURE:

Excuse me.

THE WITNESS:

I'm sorry.

BY MR. PACIERA:

Q.  You can go ahead.

A.  Okay.  At the same time, he was still handcuffed.  He was sitting on the

---

[25]*See* State rec., vol. 5 of 8, p. 268, lines 19-32; p. 269, lines 1-13.

[26]*See* State rec., vol. 5 of 8, pp. 284-286.

ground and we were starting to get everything together. We had a lot of people involved in it. He jumped up, ran out of the door - -

MR. LEFEURE:

      Objection, Your Honor.

MR. BENZ:

      Can we approach the bench, Your Honor?

THE COURT:

      All right.

 (Whereupon, the following bench discussion [involving Mr. Benz and Mr. Paciera, but not Mr. Lefevre] was held [in full view of but] outside the hearing of the jury)

MR. BENZ:

      The objection, at this time, is: If this man is going to get into the prior - to the future crime, the escape crime, and that's going to be put before the jury, and he feels that that's not necessary.

THE COURT:

      It's all part of the res gestae.

MR. BENZ:

      Okay, well, - -

THE COURT:

      I'm going to overrule the objection. I'll note his objection for the record. (Whereupon, the bench discussion was then concluded.)

BY MR. PACIERA:

Q. Okay, you were beginning to say that the Defendant was seated in the apartment, was handcuffed, is that right?

A. Correct.

Q. And, what did he do?

A. He got up and, really, without - - really quickly, he ran out the door, because everything was - - the door was still open at the time. We were just getting everything going.

Q. Is this the first apartment - - first floor or second floor apartment?

A. Second, - -

Q. Okay.

A.  - - it was on the second floor.

Q.  And, what happened, as he ran out the door?

A.  He ran out the door and he jumped over the railing.

Q.  From the second floor, down?

A.  From the second floor....

Q.  When you caught up to him, describe his actions.

A.  When we caught [up] to him, it was about a half a block away, maybe a little bit more.  We caught up to him.  He immediately went to his back, because he was handcuffed, and he began kicking at us, and he ... was definitely yelling at us.  He was saying stuff like, "You fuckers are going to have to kill me."[27]

## B.  Waiver of Counsel

In *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the Supreme Court recognized a defendant's Sixth Amendment right to waive counsel and conduct his own defense.   However, a defendant's decision in this regard must be "knowingly and intelligently made." *McQueen v. Blackburn*, 755 F.2d 1174, 1177 (5th Cir.), *cert. denied*, 474 U.S. 852, 106 S.Ct. 152, 88 L.Ed.2d 125 (1985) (citing *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984); *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)).   "'While an accused may waive the right to counsel, whether there is a proper waiver should be clearly determined by the trial court....'"   *McQueen*, 755 F.2d at 1177 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 465, 58 S.Ct. 1019, 1023, 82 L.Ed 1461 (1938)).   The trial court has a duty to ensure that the defendant is "aware of the dangers and disadvantages of self-representation" and should

---

[27]*See* State rec., vol. 5 of 8, p. 287-288; p. 289, lines 8-16.

23

make a record which establishes that the criminal defendant "'knows what he is doing and his choice is made with eyes open.'" *McQueen*, 755 F.2d at 1177 (quoting *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541) (quotation omitted).  Specifically, the record should reflect that the trial court considered "the defendant's age and education, *Mixon v. United States*, 608 F.2d 588 (5th Cir. 1979), and other background, experience, and conduct.  *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed 1461; *Middlebrooks v. United States*, 457 F.2d 657 (5th Cir. 1972)." *McQueen*, 755 F.2d at 1177.  Further, the state trial court "must be satisfied that the accused understands the nature of the charges, the consequences of the proceedings, and the practical meaning of the right he is waiving.  *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *Raulerson v. Wainwright*, 732 F.2d 803 (11th Cir. 1984)." *McQueen*, 755 F.2d at 1177.

        As the above-quoted transcript reflects, the trial court, in accepting Lefevre's waiver of his right to counsel, did not question Lefevre with respect to his age, education, background or experience.  A possible explanation for this lack of inquiry is the fact that Judge Pitre was already aware of this information.  As attested to in his affidavit (rec. doc. 29), Judge Pitre took into account the information contained in Lefevre's sanity commission report.  Said report reflects that Lefevre was 39 years old at the time of trial and that he had a high school degree.[28]  Further, Lefevre had some trial experience, having been a criminal

---

[28]While Lefevre only advanced through school to the eleventh grade, he earned his GED five years after leaving school.  *See* rec. doc. 35, sanity commission report, p. 3; *see also* rec. doc. 70, Respondent's Post-Hearing Memorandum, p. 4.

defendant in an earlier trial.[29]

The trial transcript, set forth above, also reflects that the trial court, after learning that Lefevre desired to represent himself, did not advise him of the nature of the charges he was facing and the possible sentence he faced if found guilty on those charges. However, a review of Lefevre's sanity commission report reflects that Lefevre was aware of the charges lodged against him, having recited the charges in connection with his sanity evaluation, and was aware that if found guilty on the charges he faced "a lot" of prison time.[30]

Given Lefevre's age, educational level, awareness of the charges he faced, and the fact that this was not his first experience in a criminal court proceeding, the court finds that Lefevre's waiver of counsel was knowingly and intelligently made. The court must now resolve whether or not Lefevre's right to self-representation was violated.

## C.  Right to Self-Representation

While the Supreme Court, in *Faretta*, *supra*, recognized a defendant's right to conduct his own defense, the Court also recognized that a trial court may appoint "standby counsel" to assist the defendant in his defense. The Supreme Court, in *McKaskle v. Wiggins*, 465 U.S. 168, 178, 104 S.Ct. 944, 951, 79 L.Ed.2d 122 (1984), set forth the limitations which must be placed upon the role of standby counsel to ensure the protection of a *pro se*

---

[29]Lefevre's earlier trial took place 20 years earlier and Lefevre did not represent himself in this earlier trial.  *See* rec. doc. 69, Petitioner's Post-Hearing Brief, p. 6.

[30]*See* rec. doc. 35, p. 7; *see also* rec. doc. 69, p. 6, and rec. doc. 70, p. 5.

25

defendant's right to self-representation.  The Court explained:

> First, the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury.  This is the core of the *Faretta* right.  If standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak *instead* of the defendant on any matter of importance, the *Faretta* right is eroded.
>
> Second, participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself.  The defendant's appearance in the status of one conducting his own defense is important in a criminal trial, since the right to appear *pro se* exists to affirm the accused's individual dignity and autonomy. In related contexts the courts have recognized that a defendant has a right to be present at all important stages of trial, *Snyder v. Massachusetts,* 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934), that he may not normally be forced to appear in court in shackles or prison garb, *Estelle v. Williams,* 425 U.S. 501, 504-505, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126 (1976), and that he has a right to present testimony in his own behalf, *see Harris v. New York,* 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971); *Brooks v. Tennessee,* 406 U.S. 605, 612, 92 S.Ct. 1891, 1895, 32 L.Ed.2d 358 (1972).  Appearing before the jury in the status of one who is defending himself may be equally important to the *pro se* defendant.  From the jury's perspective, the message conveyed by the defense may depend as much on the messenger as on the message itself. From the defendant's own point of view, the right to appear *pro se* can lose much of its importance if only the lawyers in the courtroom know that the right is being exercised.

*McKaskle*, 465 U.S. at 178-179, 104 S.Ct. at 951 (emphasis original).

Conversely, the *McKaskle* Court also set forth the type of tasks which standby counsel could perform without infringing upon a *pro se* defendant's right to self-representation.  The Court explained:

> *Faretta* rights are ... not infringed when standby counsel assists the *pro se* defendant in overcoming routine procedural or evidentiary obstacles to the completion of some specific task, such as introducing evidence or objecting to

testimony, that the defendant has clearly shown he wishes to complete.  Nor are they infringed when counsel merely helps to ensure the defendant's compliance with basic rules of courtroom protocol and procedure.  In neither case is there any significant interference with the defendant's actual control over the presentation of his defense.  The likelihood that the defendant's appearance in the status of one defending himself will be eroded is also slight, and in any event it is tolerable.  A defendant does not have a constitutional right to receive personal instruction from the trial judge on courtroom procedure.  Nor does the Constitution require judges to take over chores for a *pro se* defendant that would normally be attended to by trained counsel as a matter of course.  *Faretta* recognized as much.  The right of self-representation is not a license to abuse the dignity of the courtroom.  Neither is it a license not to comply with relevant rules of procedural and substantive law.

Accordingly, we make explicit today what is already implicit in *Faretta*:  A defendant's Sixth Amendment rights are not violated when a trial judge appoints standby counsel-even over the defendant's objection-to relieve the judge of the need to explain and enforce basic rules of courtroom protocol or to assist the defendant in overcoming routine obstacles that stand in the way of the defendant's achievement of his own clearly indicated goals.  Participation by counsel to steer a defendant through the basic procedures of trial is permissible even in the unlikely event that it somewhat undermines the *pro se* defendant's appearance of control over his own defense.

*McKaskle*, 465 U.S. at 183-184, 104 S.Ct. at 953-954 (quotation omitted).

Thereafter, the Court discussed the actions of Wiggins' counsel, thereby providing an example of the type of tasks standby counsel could properly perform.

At Wiggins' trial a significant part of standby counsel's participation both in and out of the jury's presence involved basic mechanics of the type we have described-informing the court of the whereabouts of witnesses, supplying Wiggins with a form needed to elect to go to the jury at the punishment phase of trial, explaining to Wiggins that he should not argue his case while questioning a witness, and so on....  When Wiggins attempted to introduce a document into evidence, but failed to mark it for identification or to lay a predicate for its introduction, counsel, at the trial court's suggestion, questioned the witness to lay an appropriate predicate, and Wiggins then resumed his examination....  Similarly, the trial judge repeatedly instructed

> Wiggins to consult with counsel, not with the court, regarding the appropriate
> procedure for summoning witnesses....

*McKaskle*, 465 U.S. at 184, 104 S.Ct. at 954.  The Court concluded:  "[W]e find these aspects

of counsel's involvement irreproachable.  None interfered with Wiggins' actual control over

his defense; none can reasonably be thought to have undermined Wiggins' appearance before

the jury in the status of a *pro se* defendant."  *McKaskle*, 465 U.S. at 185, 104 S.Ct. at 954.

        In the instant matter, a review of the trial transcript reflects that Lefevre

performed most of the trial work.  Lefevre, as opposed to standby counsel, made opening and

closing arguments to the jury.  Lefevre, rather than standby counsel, cross-examined the

State's witnesses and put on his own defense by calling and questioning a defense witness.

Lefevre also argued, outside the presence of the jury, a motion for a mistrial.   Standby

counsel's involvement consisted primarily of his participation in bench conferences.  On

three occasions, standby counsel, in response to Lefevre's objections, requested that he,

along with the prosecution, be allowed to approach the bench.

        The first such conference was called by standby counsel in response to

Lefevre's objection to the testimony of Aubrey Cox.  The purpose of said conference was

simply to have the judge instruct Cox to confine his responses to the questions which were

asked.  In accordance with standby counsel's request, and without objection from the

prosecution, the trial court admonished the witness to "wait until someone asks you a

question before you make a statement.  Don't just make spontaneous statements."[31]

The above-described action on the part of standby counsel falls squarely under the permissible "housekeeping" category.  Counsel was merely maintaining courtroom decorum by preventing a witness from providing rambling, irrelevant testimony.  However, as shown below, standby counsel's action, in connection with the second and third bench conferences, is not amenable to being "swept" into the permissible "housekeeping" category.

Via his participation in a second bench conference, standby counsel was placed in the role of having to offer argument in support of Lefevre's objection to a critical portion of Trenese Levy Baker's testimony, specifically, her in-court identification of Lefevre.[32]  Via his participation in the last bench conference, standby counsel was placed in the role of arguing that Deputy Gaudet should not be allowed to offer testify to the effect that Lefevre attempted to escape at the time of his arrest.[33]  Such testimony constituted evidence that Lefevre was guilty of a second crime, simple escape, and implied guilty knowledge in connection with the crimes for which he was standing trial.

The State seeks to trivialize the above-described conferences by asserting that the objections on which the conferences were based were not well-founded and the trial court was correct in denying the objections.[34]  Further, the State points to the affidavit of standby

---

[31]*See* discussion *supra* at p. 19.

[32]*See* State rec., vol. 5 of 8, pp. 268-269; *see also* discussion *supra* at pp. 20-21.

[33]*See* discussion *supra* at pp. 21-23.

[34]*See* rec. doc. 70, p. 9.

counsel, John Benz (rec. doc. 38), wherein he attests that to the best of his recollection, he followed Mr. Lefevre's instructions in relaying Lefevre's objections at the bench conferences.[35]  In short, the State argues that Lefevre "suffered no prejudice from Mr. Benz's participation on his behalf";[36] therefore, his right to self-representation was not violated. However, the fact that Lefevre was not prejudiced by virtue of his not participating in the bench conferences, that he would not have presented any argument which Mr. Benz did not present that would have swayed the trial judge, is irrelevant for purposes of determining whether or not his lack of participation constituted a denial of his right to self-representation. *See United States v. McDermott*, 64 F.3d 1448, 1453 (10th Cir. 1995), *cert. denied*, 516 U.S. 1121, 116 S.Ct. 930, 133 L.Ed.2d 857 (1996) (defendant's right to self-representation was violated even though defendant "does not allege that he would have done anything differently than [standby counsel] did at sidebar, or that any prejudice resulted, or that there was any failure of communication between him and [standby counsel] about the content or strategy of sidebar discussions or motions"); *Frantz v. Hazey*, 533 F.3d 724, 740 (9th Cir. 2008) ("even if [standby counsel] accurately portrayed [defendant's] wishes, unconsented-to exclusion from the conference would so substantially reduce [defendant's] ability to shape and communicate his own defense as to violate his *Faretta* rights"); *United States v. Mills*, 895 F.2d 897, 902-903 (2nd Cir.), *cert. denied*, 495 U.S. 951, 110 S.Ct. 2216, 109 L.Ed.2d 541 (1990) ("When a defendant's right to represent himself has been violated, he is entitled

---

[35]*See* rec. doc. 70, p. 10 n. 6.

[36]*See* rec. doc. 70, p. 9.

to a reversal even if he cannot show prejudice."); *McKaskle,* 465 U.S. at 177 n. 8, 104 S.Ct. at 950 n. 8 ("Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis.  The right is either respected or denied; its deprivation cannot be harmless.").

Next, the State suggests that Lefevre consented to his exclusion from the bench conferences, thereby "obliterat[ing]" his claim that his lack of participation in said conferences violated his right to self-representation.  *See McKaskle*, 465 U.S. at 182, 104 S.Ct. at 953 ("A defendant's invitation to counsel to participate in the trial obliterates any claim that the participation in question deprived the defendant of control over his own defense.").  The State bases this suggestion on the fact that Lefevre "offered no objection to Mr. Benz representing him at the bench conferences" and that "Mr. Benz's participation [in] the final two bench conferences occurred after [Lefevre] expressed his willingness for Mr. Benz to assume a 'bigger role' in his defense.  (R., Vol. 5, p. 263)."[37]  The State's argument in this regard is without merit for the following reasons.

First, in a situation such as this, where Lefevre's request to proceed without counsel was granted and he exercised his *Faretta* rights by making opening and closing arguments to the jury, cross-examining the government's witnesses, putting on his own defense by examining a witness, and arguing a motion outside the presence of the jury, it is

---

[37]*See* rec. doc. 70, pp. 9-10 and n. 5.

not presumed that Lefevre, in the absence of an objection, waived his *Faretta* rights with

respect to a particular matter, such as participating in bench conferences.  *See McDermott*,

64 F.3d at 1453 (where defendant made his own opening and closing arguments to jury,

conducted his own cross-examination of government witnesses, planned and pursued his own

defense through a witness, argued motions outside the jury's presence and, with procedural

help from standby counsel and the court, handled the admission of defense exhibits,

defendant's exclusion from bench conferences was deemed involuntary).  As the *Frantz* court

explained:

> [Standby counsel's] solo participation in the chambers conference was not
> constitutional simply because the record contains no objection by Frantz.  The
> parties do not dispute that the trial court found Frantz competent to represent
> himself.  Nor do they dispute that, despite the appointment of advisory
> counsel, the trial began with the understanding that Frantz alone was directing
> his representation at the trial.  Under such circumstances, *McKaskle* makes
> clear that-absent some basis for concluding that Frantz consented to
> representation by [standby counsel] as to the particular matter-Frantz's *Faretta*
> right remained intact.  *McKaskle* does not place the burden on *pro se*
> defendants to regulate each of their standby attorneys' actions.  To the
> contrary, *McKaskle* limits standby counsel's "*unsolicited* participation" during
> critical proceedings. 465 U.S. at 177, 104 S.Ct. 944 (emphasis added).  When
> standby counsel is appointed only to advise, the initial invocation of the right
> of self-representation is generally sufficient to establish that any participation
> by standby counsel other than for the routine matters mentioned in *McKaskle*
> is "over the defendant's objection." *Id.* at 178, 104 S.Ct. 944....

*Frantz*, 533 F.3d at 744 (citation omitted).

Second, and most importantly, there is no need for this court to speculate as to

whether Mr. Lefevre did or did not consent to standby counsel participating, in his stead, in

the two bench conferences at issue, thereby waiving his *Faretta* rights in connection with

these two bench conferences.  Mr. Lefevre specifically testified, at the April 10, 2008

evidentiary hearing, that he did not consent to standby counsel taking his place at the bench

conferences.  Lefevre explained that he was compelled to remain at counsel table, rather than

participate in the bench conferences, which were conducted in full view of the jury, as a

result of his leg shackles.

> BY MS. SCHULBERG [Lefevre's Counsel]:
> Q.  Now, do you recall whether there were bench conferences?
> A.  Yeah, I believe there was [sic] three.
> Q.  Did you attend any of them?
> A.  No, ma'am, I did not.
> Q.  Why not?
> A.  Because I couldn't step up on the little platform that the judge's bench is
> on, because of the shackles.[38]

The State, in support of its position that Lefevre's *Faretta* rights were not

violated, also relies on the case of *United States v. Mills*, 895 F.2d 897 (2nd Cir. 1990),

wherein the Second Circuit determined that the defendant's *Faretta* rights were not violated

by virtue of his exclusion from side bar conferences.  In reaching this conclusion, the *Mills*

court "relied heavily" on the principle enunciated in *McKaskle* that the "'primary focus'",

in "'determining whether a defendant's *Faretta* rights have been respected'", is "'whether

the defendant had a fair chance to present his case in his own way.'"  *McDermott*, 64 F.3d

at 1453, *quoting McKaskle*, 465 U.S. at 177, 104 S.Ct. at 950.  Observing that "Mills made

the opening statement; he cross-examined the government's witnesses; he examined his own

witnesses; ... [he] made most of whatever defense objections were made to the government's

---

[38]*See* rec. doc. 68, p. 51, lines 2-9.

questions; and [he] made his own closing argument", the Second Circuit concluded: "[W]e cannot say that Mills did not both in fact and in the perception of the jury, have a fair chance to present his case in his own way." *Mills*, 895 F.2d at 905.

The facts in *Mills* are similar to the instant situation in that Lefevre, like Mills, made the opening statement, cross-examined the government's witnesses, examined his own witness, made objections to the government's questions, and made his own closing argument. Lefevre, however, unlike Mills, was not able to perform these tasks while freely moving about the courtroom with no prohibition against approaching witnesses and/or jurors. Lefevre was compelled, as a result of his shackles, to question witnesses and address jurors while remaining behind counsel table.[39] Three persons who served on Lefevre's jury testified that while prosecutors, during various portions of the trial, moved around the courtroom to approach jurors and/or witnesses, Mr. Lefevre remained behind counsel table throughout the trial.[40]

Additionally, as the Tenth Circuit noted in *McDermott*, 64 F.3d at 1454, *McCaskle* did not end its analysis with the general principle upon which the *Mills* court relied so heavily. Instead, the Supreme Court's mandate was more specific, instructing, in pertinent

---

[39]As the court explained in *Abdullah v. Groose*, 44 F.3d 692, 695 (8th Cir. 1995), *vacated on procedural grounds*, 75 F.3d 408 (8th Cir.), *cert. denied*, 517 U.S. 1215, 116 S.Ct. 1838, 134 L.Ed.2d 941 (1996), in a situation such as this, where a shackled defendant is representing himself, "the defendant has the Hobson's choice of trying to move about as necessary in the course of his self-representation, thus drawing the jury's attention to the shackles, or conducting his defense while seated behind the counsel table."

[40]*See* rec. doc. 68, pp. 13, 20-21, 36-38 and 43.

34

part, that a defendant's *Faretta* rights are eroded "[if] standby counsel's participation over the defendant's objection effectively allows counsel ... *to speak instead of the defendant on any matter of importance".  McKaskle*, 465 U.S. at 178, 104 S.Ct. at 951 (emphasis added).

The court finds that Mr. Benz's participation in the pertinent two bench conferences effectively allowed him to speak instead of Mr. Lefevre on matters of importance.  The importance of these two bench conferences is illuminated when they are compared with conferences which have been deemed unimportant for purposes of supporting a finding that the *pro se* defendant's exclusion from the conferences constituted a denial of his right to self-representation.

In *Thornton v. Wall*, 2003 WL 1810524 (D.R.I. Mar. 31, 2003), a *pro se* defendant was not allowed to attend six in-chambers conferences and claimed that his exclusion from said conferences constituted a denial of his Sixth Amendment right to self-representation.  In deciding this issue, via a *de novo* review, the magistrate judge examined the subject matter of these conferences, explaining:

> Here, there were six in chambers conferences where the trial judge excluded the *pro se* defendant, with the first five occurring before the trial began. The first chambers conference concerned Thornton's request to hire an expert witness. The second chambers conference concerned Thornton's motion to perform various medical tests and to set deadlines for those test[s] to be completed. The third chambers conference was initiated by the trial justice for the sole purpose of informing the parties that he would permit the defendant's expert witness to testify. These three conferences were resolved all in Thornton's favor....
> The fourth chambers conference concerned a request by Thornton to be furnished with all other previous criminal trial transcripts in which Thornton had been a defendant, at the state's expense. None of the witnesses in the prior trials were expected to be called in Thornton's upcoming trial. The trial justice

denied Thornton's request....

 The fifth chambers conference occurred during voir dire when a prospective juror indicated that he could not be impartial. During the chambers conference ... this juror, who was biased against Thornton, was excused.

 The sixth chambers conference occurred during the trial. During the trial, one of the jurors notified the trial judge that he had realized that he was acquainted with the defense's expert witness. The trial justice questioned the juror in chambers and in the presence of the prosecutor and standby counsel. The prosecutor, standby counsel, and trial judge agreed that the juror could remain impartial and was permitted to remain on the jury.

*Thornton*, 2003 WL at *10.

 Thus, five of the six conferences resulted in decisions either favorable to the *pro se* defendant or to which he had no objection.  The only conference regarding a disputed matter, from the defendant's perspective, was the fourth which took place before trial proceedings commenced and concerned defendant's request for transcripts of his prior trials, none of which involved any of the witnesses set to testify in connection with the charges for which defendant was currently facing trial.  Such a pre-trial request, given its irrelevance to the upcoming trial, can clearly be categorized as a "housekeeping" matter, leading Magistrate Judge Hagopian to conclude:  "[T]he trial judge erred in not permitting Thornton to make his own arguments and express his views at these chambers conferences.  However, these minor incursions, albeit regrettable, did not amount to a violation of the petitioner's Sixth Amendment rights.  *Thornton*, 2003 WL at *11.

 In contrast, the bench conferences which Lefevre could not attend involved contested matters.  Of particular significance was the conference concerning Lefevre's objection to Officer Gaudet's testimony regarding Lefevre's attempted escape.  Said

testimony clearly placed Lefevre in a most unflattering light, depicting him as a desperate individual, jumping while handcuffed from a second story balcony and continuing to struggle even after he was caught, kicking and screaming at officers, threatening that they would have to kill him.   A review of standby counsel's bench conference argument in support of Lefevre's objection to this damaging testimony represents, at best, a half-hearted effort with counsel merely asserting that the testimony was "not necessary".[41]   The significance of the subject matter of the conference, coupled with standby counsel's less than rigorous argument in support of Lefevre's objection, places the conference in stark contrast to the undisputed, housekeeping matters which the *Thornton* court deemed "minor incursions" into the *pro se* defendant's right to self-representation.

Finally, this court is mindful of the fact that its determination that Mr. Lefevre suffered a constitutional violation is based primarily on the fact that he was excluded from two bench conferences, as opposed, for example, to his being excluded from numerous bench conferences as was the case in *McDermott*, *supra*.[42]   The Tenth Circuit in *McDermott*, 64 F.3d at 1454, along with the Ninth Circuit in *Frantz*, 533 F.3d at 741, recognized that *McKaskle* "seems to stop short of a per se rule" when it provides that standby counsel's

---

[41]*See* discussion *supra* at pp. 21-23.

[42]Of course, as the Supreme Court set forth in *McKaskle*, *supra*, it is the "importance" of the conferences from which the *pro se* defendant was excluded, as opposed to the number of conferences at issue, which is determinative of whether a constitutional violation has occurred.   This principle is exemplified by the facts at issue in *Frantz*, *supra*, wherein the *pro se* defendant's unconsented-to absence from a single in-chambers conference was deemed sufficient to constitute a violation of his right to self-representation.

participation in substantive matters erodes a defendant's *Faretta* rights.  "'Erode' is not a synonym for 'violate.'" *McDermott*, 64 F.3d at 1454; *Frantz*, 533 F.3d at 741.   In some cases, "standby counsel can 'erode' *Faretta* rights without violating them." *Frantz*, 533 F.3d at 741.  For the following reasons, the instant matter does not represent such a case.

As noted earlier, the jury did not see Lefevre's leg shackles.  The reason for this was because Lefevre remained behind counsel table, where his leg shackles were hidden from view.  This court has found three cases, *United States v. Fields*, 483 F.3d 313, 357 (5th Cir. 2007), *cert. denied*, __ U.S. __, 128 S.Ct. 1065, 169 L.Ed.2d 814 (2008), *Overton v. Mathes*, 425 F.3d 518, 520 (8th Cir. 2005), *cert. denied*, 546 U.S. 1182, 126 S.Ct. 1358, 164 L.Ed.2d 69 (2006), and *Frantz*, 533 F.3d at 728, wherein a defendant representing himself before a jury was required to wear restraints, but the restraints were hidden from view because the defendant remained behind counsel table.  In all of these cases, the respective courts, in an effort to "level the playing field", required the prosecution, like the restrained *pro se* defendant, to present its case from behind counsel table.  *See Fields*, 483 F.3d at 357 ("[T]he district court appropriately took steps to minimize any risk of prejudice.  Fields was allowed to conceal the stun belt under street clothes.  Moreover, the  court took into account the special problems that physical restraints might pose under Fields's decision to proceed *pro se*.  It provided that both sides would remain seated before the jury.  These steps ensured that the jury would neither see the stun belt nor surmise that Fields was being treated differently from the prosecutors."); *Overton*, 425 F.3d at 520 (The trial judge "ordered that both Overton and prosecutor would conduct the trial from counsel tables, and the jury would

38

be excused when a sidebar conference was needed, so as to not disadvantage Overton.");

*Frantz*, 533 F.3d at 728 (Frantz was required to "wear a leg brace" and required to question

witnesses from behind the defense table to minimize the risk of prejudice "from the jury's

viewing his shackles."  The prosecutor was also required to examine witnesses and argue her

case from behind counsel table.).  No such accommodation was made for Mr. Lefevre.  As

set forth above, three of the persons who served as jurors at Lefevre's trial testified at the

April 10, 2008 evidentiary hearing that the prosecutors, in presenting their case against

Lefevre, were able to approach witnesses in questioning them and approach jurors in

presenting arguments to them, but Mr. Lefevre was compelled to defend himself against the

State's charges while remaining firmly ensconced behind counsel table.[43]

Based upon the above, along with the fact that stand-by counsel, by virtue of

his participation in the above-described bench conferences, was allowed to speak instead of

Lefevre on matters of importance, the court finds that Mr. Lefevre suffered a violation of his

right to self-representation.[44]  Accordingly;

---

[43]The State seeks to minimize the significance of the fact that the prosecutors were allowed to freely move about the courtroom in presenting their case against Lefevre while Lefevre, by virtue of his shackles, was compelled to remain behind counsel table, by pointing to jurors' testimony to the effect that they did not believe the prosecutors gained a tactical advantage due to the fact that they were able to freely move about the courtroom.  *See* rec. doc. 70, p. 11.  Again, however, the fact that Lefevre may not have been prejudiced by virtue of the fact that his right to self-representation was violated when he alone was compelled to present his case from behind counsel table, is irrelevant.  *See* discussion *supra* at pp. 30-31.

[44]Based upon the court's finding in this regard, there is no need for the court to address Lefevre's remaining habeas claims.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that David Lefevre's petition for issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be **GRANTED**, releasing petitioner Lefevre unless the State notifies the court within 120 days from the date a final Judgment is entered in this matter of its intent to retry petitioner.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this   22nd   day of ____September____, 2008.

LOUIS MOORE, JR.
United States Magistrate Judge